IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUZANNE SALISBURY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-cv-0125 |
| v. | ) | |
| | ) | |
| | ) | |
| CITY OF PITTSBURGH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

CONTI, District Judge

Pending before this court is the motion for summary judgment (Docket No. 24) filed by defendant City of Pittsburgh ("defendant"). Plaintiff Suzanne Salisbury ("Salisbury" or "plaintiff") filed this civil action asserting claims under 42 U.S.C. § 1983 for violations of equal protection under the Fourteenth Amendment of the United States Constitution and the right to petition under the First Amendment of the United States Constitution, Title VII of the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. ANN. §§ 950 *et seq*. ("PHRA"). The claims include allegations of race and gender discrimination, as well as retaliation for filing a lawsuit against a previous employer. Plaintiff filed these claims with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC") and received right to sue letters.

In considering the submissions of the parties, viewing all disputed facts in plaintiff's favor, and drawing all reasonable inferences in plaintiff's favor, and examining the record as a

whole, the court concludes that there are genuine issues of material fact that preclude granting a judgment as a matter of law on any of plaintiff's claims.

## **Factual Background**

The City of Pittsburgh department of emergency medicine services (the "EMS") seeks applications for new hires through advertisement or posting. (Combined Concise Statement of Material Facts ("C.S.") ¶ 4.) (Docket No. 38.)  The applications are reviewed by the department of personnel to ensure that the applicants are qualified and meet all the necessary requirements and certifications. (*Id*.)  Qualified candidate's files are then forwarded to the office of municipal investigations ("OMI") for background checks. (C.S. ¶ 5.)  Once OMI clears the candidate, the application is forwarded to the EMS command staff for consideration and review. (C.S. ¶ 6.) Candidates remain on the eligibility list for a three-year period. (Plaintiff's Statement of Material Facts ("P.S.") ¶ 95.)  Chief Robert McCaughan ("McCaughan") is the ultimate decision maker in deciding whether or not to hire for the EMS. (C.S. ¶ 7.)  Chief McCaughan is assisted by Deputy Chief Mark Bocian ("Bocian"), Assistant Chief John Moon ("Moon"), and Medical Director Ron Roth ("Roth") in making decisions about which candidates should receive interviews and be hired. (C.S. ¶ 8.)

Salisbury is an African-American female residing in the City of Pittsburgh. (C.S. ¶1.)  In 1997 she received a state certification to be a paramedic. (C.S. ¶ 2.)  Since she passed the state certification, plaintiff's license was kept current and is not suspended. (P.S. ¶11.)  Plaintiff's first position as a paramedic was with Transcare Ambulance Service ("Transcare").  (P.S. ¶ 13.) Plaintiff worked at Transcare from 1997 until she was terminated in March 2000. (P.S. ¶ 15.) Plaintiff presently works part-time for Guardian Angel Ambulance Service. (P.S. ¶¶ 40, 43.)

2

During her time at Transcare, Salisbury became involved with an attempt to unionize the medical service providers, including paramedics. (P.S. ¶¶ 16, 17.)  Plaintiff was terminated from Transcare for allegedly not following protocol.  Plaintiff, however, believed that the termination was in retaliation for her unionization attempts.  (P.S. ¶¶ 31, 32.)  Subsequent to her termination, plaintiff filed a complaint with the National Labor Relations Board ("NLRB") against Transcare.  (P.S. ¶ 33.)  Plaintiff's complaint against Transcare was resolved in a settlement negotiated between the NLRB and Transcare.  (P.S. ¶¶ 36, 37.)

In July 2005, Salisbury applied for the position of paramedic with the EMS.  (C.S. ¶ 3.)  In the application, plaintiff was asked if she had ever sued anyone and she indicated the prior lawsuit against Transcare.  (P.S. ¶¶ 55, 56.)  Plaintiff answered questions concerning her credit history and reported that she had a previous bankruptcy.  (P.S. ¶ 57.)  Plaintiff was found to be qualified by the department of personnel and civil service and her applicant file was forwarded to OMI for background investigation.  (C.S. ¶ 9.)  Plaintiff's applicant file included a hand-written application, police polygraph examination, doctor reports, a credit report, information from prior employers, educational information, a civil service application, a listing of prior employment, and recommendations and references.  (C.S. ¶ 10.)

Prior to making a decision to interview, on August 5, 2005, McCaughan received negative recommendations about plaintiff from two EMS employees, Stacey Yaras ("Yaras") and Stephen ("Steve") Carlson ("Carlson").  (C.S. ¶¶ 20, 29, 30.)  Plaintiff stated, however, that Yaras was an individual who had exhibited bias against African-American employees when they worked together.  (P.S. ¶ 124.)  McCaughan also contacted Dave Nicholas ("Nicholas"), the director of plaintiff's prior employer Guardian Angel Ambulance Service.  (Def.'s App. Ex. 2,

McCaughan Dep. 29-30.)  McCaughan was told by Nicholas that plaintiff was a decent paramedic, but lacked attitude and sometimes had scheduling issues and that overall she was a "mixed bag." (*Id*.)  Additionally, McCaughan contacted Steve Sallinger from Transcare, another of plaintiff's prior employers, who stated that plaintiff did something against their procedures and was terminated.  (C.S. ¶ 25.)

OMI gave a negative recommendation of plaintiff, including information that plaintiff had sued a previous employer and that she had financial problems.  (C.S. ¶ 16.)  McCaughan sent an email to Kraus inquiring whether Kraus thought that plaintiff should be interviewed.  (P.S. ¶ 101.)  Kraus responded to McCaughan stating that "DON'T INTERVIEW HER.  SHE IS BAD NEWS." (P.S. ¶ 104.)  McCaughan asked Kraus for some insight about why plaintiff was "bad news" and Kraus responded "SHE SUED A PREVIOUS EMPLOYER AND HAS ALL KINDS OF FINANCIAL PROBLEMS." (P.S. ¶¶ 105, 106, Pl.'s App. Ex. 10.)  McCaughan testified that he informed both Bocian and Moon about Kraus' recommendation as he thought it was something they should consider as a part of the decision-making process.  (P.S. ¶ 109.)  After receiving plaintiff's application and materials from OMI, a decision was made not to interview or hire plaintiff.  (C.S. ¶ 11.)

After approximately a year, plaintiff inquired why she had not received an interview by defendant.  (P.S. ¶ 65.)  Plaintiff contacted Moon and McCaughan concerning why she had not been called for an interview.  (P.S. ¶¶ 68-70.)  Plaintiff testified that McCaughan told her that she was found to be an unfavorable candidate due to her "criminal background check." (P.S. ¶¶ 71, 72.)  McCaughan referred plaintiff to speak to Kraus from OMI.  (P.S. ¶ 73.)  Plaintiff stated that Kraus indicated to her that she was not hired as a result of her "criminal background check."

4

(P.S. ¶ 75.)  Kraus and McCaughan, however, deny that they told plaintiff she was not hired because of her criminal background.  (Pl.'s App. Ex.6, Kraus Dep. 19; P.S. ¶ 79.)  It was suggested to plaintiff by Kraus that plaintiff have her own criminal background check performed which she did and found no record of any criminal history.  (P.S. ¶¶ 77, 80.)

On May 31, 2007, plaintiff filed a complaint with the EEOC and PHRA claiming race discrimination.  (Pl.'s App. Ex.1.)  Defendant responded to plaintiff's EEOC charge of discrimination on August 3, 2007.  (P.S. ¶ 118.)  The document was signed by McCaughan, Bocian and Moon and stated that the reasons plaintiff was not interviewed and hired were because she received a negative recommendation by OMI, she received several negative recommendations by Pittsburgh EMS personnel, she was terminated by Transcare (as noted on her candidate processing form), and she was suspended from Guardian Angel Ambulance Service (as noted on her candidate processing form).  (Pl.'s App. Ex. 11.)  McCaughan agreed that the OMI recommendation referenced in the August 3, 2007 document was the email he received from Kraus on August 29, 2005.  (P.S. ¶ 121.)

McCaughan testified that after reviewing all the various information available about plaintiff,  he, together with Bocian and Moon, agreed that plaintiff would not be interviewed.  (Def.'s  Ex. 2, McCaughan Dep. 59.)  McCaughan indicated that in 2005 he was aware that plaintiff was an African-American.  (*Id.*)  McCaughan stated that in 2005 he spoke to Moon about the desire to improve the EMS's diversity.  (Def.'s  Ex. 2, McCaughan Dep. 73.)  When asked if suing a former employer would be a consideration in the hiring process, McCaughan responded:  "Not necessarily.  I mean people sue people for who knows what.  It may have been

in consideration, but I would not say it was overwhelming." (P.S. ¶ 110, Pl's App. Ex. 5, McCaughan Dep. 42.)

McCaughan testified that OMI does not remove candidates from consideration, rather they give recommendations. (C.S. ¶ 18.) McCaughan stated that a credit problem would not necessarily determine whether a candidate would be interviewed. (C.S. ¶ 19.) McCaughan indicated that a credit problem could provide insight that an applicant may be irresponsible. (*Id*.) He stated that since personnel are often in homes of individuals, a person with financial concerns may be placed in a situation where they might be tempted. (Def.'s App. Ex. 2, McCaughan Dep. 41-42.) McCaughan recalled that plaintiff's background information included an incident of her allowing someone of lesser certification to perform advanced techniques. (C.S. ¶ 19.) McCaughan testified that he had concerns about plaintiff having been terminated from prior pre-hospital care jobs. (C.S. ¶ 22.) McCaughan testified that he never hired a candidate who had a negative recommendation from EMS personnel. (C.S. ¶ 21.)

Kraus testified that aside from plaintiff, she could not recall another time where she told McCaughan not to interview a candidate. (P.S. ¶ 111.) Kraus stated that the problem she had with plaintiff suing a prior employer is that it brought up concerns regarding her termination from Transcare and defendant would be unable to find out the circumstances surrounding the termination due to confidentiality agreements. (P.S. ¶ 114.)

Bocian stated that there was no one specific reason for the decision not to interview or hire plaintiff. (C.S. ¶11.) Bocian recalled that plaintiff received a negative recommendation from OMI and that her background information included having been terminated by one employer, suspended by another employer and having two negative recommendations from

current EMS employees.  (*Id.*)  Bocian stated that a negative recommendation from OMI would be "one piece of the puzzle" in deciding whether or not to interview and hire.  (C.S. ¶ 13.)  Bocian commented that plaintiff's prior termination from an ambulance company would be one part of a series of reasons not to interview her.  (C.S. ¶ 14.)  Bocian recalled that plaintiff's materials included an incident where plaintiff allowed someone who should not have been doing advanced life support skills to perform them.  (C.S. ¶ 17.)  Bocian testified that he was unaware of plaintiff's race when the decision was made to not interview or hire her.  (C.S. ¶ 15.)

Moon stated that he never made a recommendation about whether or not plaintiff should be interviewed.  (P.S. ¶ 141.)  Moon mentioned that he did not remember McCaughan telling him why plaintiff was not going to be interviewed.  (P.S. ¶ 142.)  When plaintiff called Moon to ask him why she was not given an interview he referred her to McCaughan as he did not have any understanding about why she was not given an interview.  (P.S. ¶¶ 145-48.)  Moon testified that the only discussion he could recall having with McCaughan, concerning the reason why plaintiff was not interviewed, occurred after plaintiff filed her formal complaint.  (P.S. ¶ 149.)  Moon testified that he was not aware that Kraus provided McCaughan information concerning plaintiff.  (P.S. ¶ 151, Pl.'s Ex. 3 at 26.)  Moon stated that an individual's financial condition was not something he would consider in the hiring process.  (P.S. ¶ 152.)

Plaintiff stated that there are not a lot of minority women paramedics.  (C.S. ¶ 33.)  Plaintiff testified that she never heard from any minority female paramedic that the defendant does not hire minorities or females.  (C.S. ¶ 34.)  Plaintiff also stated that she has not heard from anyone that McCaughan has personal animus towards minorities.  (C.S. ¶ 35.)  Plaintiff admitted having no knowledge about whether Moon had any animus towards females.  (C.S. ¶ 36.)

Plaintiff's eligibility hire date ran from July 11, 2005 to August 14, 2008. (C.S. ¶ 37.) During that time sixty-three qualified applicants were considered for hire by defendant. (*Id.*) Of the sixty-three applicants, twelve were women, of which ten were hired. (C.S. ¶ 38.) Of the sixty-three applicants, five were African-Americans, three of which were hired. (C.S. ¶ 39.) The number of white applicants was fifty-three, of which twenty-eight were hired. (C.S. ¶ 40.) Plaintiff offered the following statistics in her statement of material facts. From June 6, 2005, to June 2, 2008, defendant hired twenty-two paramedics. (P.S. ¶ 128.) Of the twenty-eight hired, twenty-one were white, fifteen were men and seven were women. (P.S. ¶¶ 129, 130.)

Plaintiff indicated that defendant hired a white male applicant who was terminated from two private ambulance service companies and he failed to disclose the termination on his application. (P.S. ¶ 134.) This same individual also had credit problems and had filed for bankruptcy. (P.S. ¶ 135.) This applicant was also a defendant in a lawsuit and had failed to pay school taxes. (P.S. ¶ 136.) Defendant hired two white female applicants who had credit problems, filed for bankruptcy, were subject to a mortgage foreclosure and had an outstanding money judgment. (P.S. ¶¶ 137, 138.)

### Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Concrete evidence must be provided for each element of each of the claims, and the evidence must be such that a reasonable fact-finder could find in that party's favor at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247- 48 (1986). "A nonmoving party, like plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'" *Orenge v. Veneman*, No. 04-297, 2006 WL 2711651, at *6 (W.D.Pa. Sept.20, 2006) (quoting *Celotex*, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson*, 477 U.S. at 248. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment. *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir.1993); *Pollack v. City of Newark*, 147 F.Supp. 35, 39 (D.N.J.1956), *aff'd*, 248 F.2d 543 (3d Cir.1957)(citing 6 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE 2061 (2d ed. 1955) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence")).

<u>**Discussion**</u>

Defendant seeks summary judgment with respect to all plaintiff's claims.  Defendant's argument in support of summary judgment against plaintiff's race and gender discrimination claims is that she cannot establish a prima facie case of discrimination and there is no evidence of pretext.  With respect to plaintiff's First Amendment retaliation claim, defendant argues that plaintiff did not adduce evidence sufficient to prove that her protected First Amendment activity was a motivating or substantial factor in defendant's decision not to hire her.  Plaintiff asserts that there are genuine issues of material fact in dispute for all her claims and that summary judgment cannot be granted in defendant's favor.  The court will address all plaintiff's claims.

**I.      Race and Gender Discrimination Claims (Counts I, II, III, and IV)**

**A.      Elements of a prima facie case**

Plaintiff's race and gender discrimination claims under Title VII, § 1983, § 1981, and the PHRA are analyzed together for summary judgment purposes.  *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir.1999); *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir.1997); *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (assuming Title VII burden-shifting framework applies to a claim brought under § 1983).  Title VII was enacted to prohibit employers from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment.  *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315 (3d Cir. 2008) (citing *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 n.4 (3d Cir. 2000)).  Since 1972 Title VII has required that personnel actions affecting employees "shall be made free from any discrimination based on race, color, religion, sex or national origin."  42 U.S.C. § 2000e-16(a).  The Supreme Court recognized that it

is often difficult to prove that an employer acted with conscious intent to discriminate.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  One manner in which plaintiffs can

meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for

the challenged action is not the true reason, but rather was a pretext for unlawful discrimination.

*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

In *McDonnell Douglas*, the Supreme Court developed the now familiar burden-shifting

framework for courts to utilize as a tool in analyzing disparate treatment claims.  The *McDonnell*

*Douglas* framework requires a plaintiff alleging a violation of Title VII to first establish a prima

facie case of discrimination.  The prima facie case, the elements of which depend upon the kind

of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the

plaintiff's rejection."  *Burdine*, 450 U.S. at 254; *see also Id*. at 254 n.6.  In so doing, "the *prima*

*facie* case 'raises an inference of discrimination only because we presume these acts, if otherwise

unexplained, are more likely than not based on the consideration of impermissible factors.'"  *Id*.

at 254 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden

of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate,

nondiscriminatory reason for the adverse employment decision.  *Simpson v. Kay Jewelers*, *Div.*

*of Sterling, Inc.*, 142 F.3d 639, 644 n.5 (3d Cir. 1998).  The burden on the defendant at this

junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence

which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for

the unfavorable employment decision."  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d

Cir.1994)(citing *St. Mary's Honor Ctr.*, 509 U.S. at 509).

11

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the *McDonnell Douglas* framework-with its presumptions and burdens'-disappear[s], . . . and the sole remaining issue [is] 'discrimination vel non,'. . . ." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (citations omitted).  The plaintiff has the burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination.  *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d at 410.

To state a claim for race or gender discrimination under Title VII, a plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position for which she applied; (3) she suffered an adverse employment decision; and (4) similarly situated individuals outside the protected class were hired or promoted instead.  *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061 (3d Cir. 1996).

Plaintiff does not dispute that this is a circumstantial evidence case and that the burden shifting *McDonnell Douglas* analysis applies.  Furthermore, defendant does not dispute that plaintiff can meet the first and third elements of the prima facie case: she is a member of a protected class, and she suffered an adverse employment decision.  Defendant contends, however, that plaintiff was not qualified for the position applied for, and there is no inference that plaintiff was treated less favorably than individuals outside the protected class.  Each of these arguments will be addressed in turn.

1.  **Qualified for the Position**.

Defendant argues that plaintiff cannot produce evidence that she was similarly situated to the applicants that were hired by defendant.  Despite defendant characterizing plaintiff as an eligible "qualified" applicant from July 2006 to August 2008, defendant argues that Salisbury was unqualified for the position because of her negative work history, credit report and negative evaluations.  These reasons, however, are the same as defendant's legitimate and nondiscriminatory reasons for not hiring plaintiff.  The United States Court of Appeals for the Third Circuit has held that

> [i]n Title VII cases involving a dispute over 'subjective' qualifications, we have recognized that the qualification issue should often be resolved in the second and third stages of the *McDonnell Douglas/Burdine* analysis, to avoid putting too onerous a burden on the plaintiff in establishing a prima facie case . . . . [b]ecause the prima facie case is easily made out, it is rarely the focus of the ultimate disagreement.

*Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1993)(citing *Fowle v. C & C Cola*, 868 F.2d 59, 64 (3d Cir.1989) and *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 n.1 (3d Cir.1988)).  Since there is no dispute that plaintiff held the objective qualifications and necessary licenses to be a paramedic and was deemed to be "qualified" and eligible to be hired by defendant, plaintiff adduced sufficient evidence to meet this element of her prima facie case.

2.  **Similarly Situated Individuals Outside the Protected Class Were Hired**.

Defendant argues that since three of five African-Americans and ten of twelve females were hired during plaintiff's eligibility period, there can be no inference that she was not hired because of her race or gender.  In order to meet the fourth prong of a prima facie case all a

13

plaintiff must show is "that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas*, 411 U.S. at 802.  The record indicates that defendant hired individuals not of plaintiff's race and gender after she was rejected from the position.  Defendant's hiring members of plaintiff's race and gender is simply not relevant to the determination whether plaintiff can establish a prima facie case.  "[A]n employer does not have to discriminate against all members of a class to illegally discriminate against a given member of that class." *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000).  As a result, plaintiff adduced sufficient evidence to meet all the elements of the prima facie case and the *McDonnell Douglas* analysis shifts to the next step.

**B.     Legitimate and Nondiscriminatory Reasons**

Once a plaintiff has established a prima facie case the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for reasons that are legitimate and nondiscriminatory. *Burdine*, 450 U.S. at 254.  An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision. *Fuentes*, 32 F.3d at 763; *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 509.  It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers. *Burdine*, 450 U.S. at 254; *see Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978).

Defendant states that the decision makers' reasons for not hiring plaintiff are: plaintiff received negative reviews from her former employers, she was disciplined and fired by her

14

former employers, she breached paramedic protocol at her past employment, she had a negative

background check, including a history of credit problems, and she received negative references

from two City of Pittsburgh EMS employees that had worked with her in the past.  Plaintiff does

not dispute that defendant articulated nondiscriminatory reasons for its decision not to hire her

and that she must offer evidence of pretext to defeat defendant's motion.

**C.**     **Pretext Analysis**

The last part of the *McDonnell Douglas* framework requires that,

> [o]nce the employer answers its relatively light burden by articulating a
> legitimate reason for the unfavorable employment decision, the burden of
> production rebounds to the plaintiff, who must now show by a
> preponderance of the evidence that the employer's explanation is
> pretextual (thus meeting the plaintiff's burden of persuasion)."

*Fuentes*, 32 F.3d at 763.  Once an employer has stated a legitimate, nondiscriminatory reason for

the adverse employment action, the plaintiff, in order to survive summary judgment, must meet

the two-prong test articulated by the United States Court of Appeals for the Third Circuit in

*Fuentes*:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from
> which a factfinder could reasonably either (1) disbelieve the employer's
> articulated legitimate reasons; or (2) believe that an invidious
> discriminatory reason was more likely than not a motivating or
> determinative cause of the employer's action.

*Id.* at 764 (citing *Hicks*, 509 U.S. at 511); *Ezold v. Wolf, Block, Schoor & Solis-Cohen*, 983 F.2d

509, 523 (3d Cir. 1992)(quoting *Burdine*, 450 U.S. at 256).

With respect to the first prong, a plaintiff must submit evidence that could cause a

reasonable fact-finder to discredit the employer's articulated reason for the adverse employment

action in order to overcome summary judgment and bring her case to trial. To discredit the

employer's articulated reason, the plaintiff does not need to produce evidence that necessarily

leads to the conclusion that the employer acted for discriminatory reasons, *Sempier v. Johnson &*

*Higgins*, 45 F.3d 724, 729 (3d Cir. 1995), nor produce additional evidence beyond her prima

facie case. *Fuentes*, 32 F.3d at 764. The plaintiff must, however, demonstrate:

> "weaknesses, implausibilities, inconsistencies., incoherencies, or contradictions in
> the employer's proffered legitimate reasons [such] that a reasonable factfinder
> could rationally find them 'unworthy of credence'" and hence infer that the
> proffered nondiscriminatory reason "did not actually motivate" the employer's
> action. [ *Fuente*s, 32 F.3d] at 764-65 (quoting *Ezold*, 983 F.2d at 531 ).

*Simpson*, 142 F.3d at 644.

The question asked in prong one of the *Fuentes* test is not whether the employer made the

best, or even a sound, business decision; it is whether the real reason for the adverse result

suffered by the plaintiff is discrimination. *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109

(3d Cir.1997) "Where the plaintiff does offer evidence that would allow reasonable minds to

conclude that the evidence of pretext is more credible than the employer's justifications, the

employer's motion for summary judgment must fail." *Iadimarco v. Runyon*, 190 F.3d 151, 166

(3d Cir. 1999) (citing *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 62 (3d Cir.1989)).  An

example of where the United States Court of Appeals for the Third Circuit found such

inconsistences with the employer's reasons that they were unworthy of credence was in

*Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265 (3d Cir. 2001).  In *Abramson*,

the plaintiff argued that "the ever-changing nature of the proffered reasons can be considered as

detracting from their legitimacy."  *Id*. at 284.  The court agreed holding "[i]f a plaintiff

demonstrates that the reasons given for her termination did not remain consistent, beginning at

the time they were proffered and continuing throughout the proceedings, this may be viewed as

evidence tending to show pretext, though of course it should be considered in light of the entire record." *Id*. (citing *Fuentes*, 32 F.3d at 765; *Waddell v. Small Tube Prods., Inc*., 799 F.2d 69, 73 (3d Cir.1986)).

Plaintiff argues that pretext is shown because the initial reason given to plaintiff about why she was not hired was false, the reasons for her not being hired changed after she filed a charge of discrimination and the subsequent reasons given were not applied equally to other candidates.  Plaintiff alleges that she was initially told by McCaughan and Kraus that she was not interviewed because of her criminal background check. (P.S. ¶¶ 70-72, 78.)  At the suggestion of Kraus, plaintiff had her own criminal background check performed which indicated that plaintiff had no criminal record. (P.S. ¶¶ 77, 80.)  McCaughan denies that he told plaintiff that she was not hired because of her criminal background check.  (P.S. ¶ 79.)  McCaughan stated that he only told plaintiff it was her background check that was the reason for her not being hired.  (*Id*.)  Kraus, however, remembered that plaintiff asked specifically about her criminal history.  (Pl.'s App. Ex. 6, Kraus Dep. 23-24.)  Plaintiff testified that she recalled McCaughan telling her it was a criminal background check that was the reason for her not being hired.  (Pl.'s App. Ex. 2, Salisbury Dep. 85.)  Kraus indicated that at the time of plaintiff's application, OMI did not conduct criminal background checks on applicants. (P.S. ¶ 83.)

Plaintiff alleges that the only reason given to her prior to her filing an EEOC charge of discrimination was that she was not hired because of her criminal background check.  After she filed the charge of discrimination, on August 3, 2007, plaintiff received a response indicating new reasons for her not being hired. (Pl.'s App.. Ex 11.)  The document stated that plaintiff was not considered or asked to be interview because (1) she received a negative recommendation by

17

OMI, (2) she received several negative recommendations by Pittsburgh EMS personnel, (3) she was terminated by Transcare, and (4) she was suspended from Guardian Angel Ambulance Service. (*Id.*) The document was signed by McCaughan, Bocian and Moon. (*Id.*) The document did not include any mention of a criminal background check being the reason why plaintiff was not hired.

Plaintiff argues that a jury could make the inference that defendant's stated reasons were not the true reasons why plaintiff was not hired based upon the following: no criminal background check was actually conducted; the criminal background check was not an included reason in the August 3, 2007 document; and that document included new reasons for plaintiff not being hired. The court concludes that weighing the evidence in the light most favorable to plaintiff, the nonmoving party, the inconsistencies in the reasons why plaintiff was not interviewed or hired may cause a reasonable jury to disbelieve defendant's nondiscriminatory reasons. Although a background check was performed by OMI, the court cannot simply credit the testimony of McCaughan and Kraus over plaintiff's testimony that they told plaintiff she was not interviewed because of her criminal background check. If this court did so, the court would not view the evidence in the light most favorable to the nonmovant.

Plaintiff points to other factual disputes in the record, including that Moon testified that he never made any recommendation about whether plaintiff should be hired or interviewed and that Moon stated he was unaware about why it was decided plaintiff would not be given an interview. (P.S. ¶¶ 147-48.) In light of the evidence presented by plaintiff, the court concludes plaintiff adduced sufficient evidence under the first prong of the *Fuentes* test. Since a reasonable jury could infer that defendant's stated reasons for not hiring plaintiff are not the true reasons, the

court concludes that a reasonable jury could render a verdict in favor of plaintiff on her claims.

*See Fuentes*, 32 F.3d at 764.

Plaintiff argues that pretext can also be found under the second prong of the *Fuentes* test:

> To show that discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that would allow a factfinder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision.

*Simpson*, 142 F.3d at 644-45.   Relevant evidence that could be relied on in the evaluation of this prong includes: (1) whether the employer has previously discriminated against the plaintiff, (2) whether the employer has discriminated against other people within the plaintiff's protected class or within another protected class, or (3) whether the employer has treated more favorably similarly situated persons not within the protected class.  *Id.* at 645.  Plaintiff points to defendant's stating that plaintiff's credit history was a reason for her not being hired, but hiring other applicants – a white male and white women –  not in plaintiff's protected class (gender or race as the case may be) with credit history problems.  (P.S. ¶¶ 134-38.)  This evidence is sufficient to meet the second prong as a reasonable factfinder may conclude that the employer more favorably treated similarly situated persons not within the protected class.  In considering the evidence adduced by plaintiff with respect to pretext and considering the record as a whole, the court concludes that there are genuine issues of material fact that preclude granting summary judgment on plaintiff's race and gender discrimination claims.

**II.    First Amendment Retaliation Claim (Count V)**

To establish a prima facie claim under a § 1983 of First Amendment retaliation, a plaintiff must show that (1) she engaged in protected activity, and (2) the protected activity was a

substantial or motivating factor in the allegedly retaliatory action.  *Springer v. Henry*, 435 F.3d

268, 275 (3d Cir. 2006)(citing *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005)).  If the

plaintiff establishes those two elements, the burden shifts to the employer to demonstrate "'that

the same adverse action would have taken place in the absence of the protected conduct.'"  *Smith

v. Central Dauphin Sch. Dist.*, 2009 U.S. App. LEXIS 26996, at *8 (3d Cir.  Dec. 11, 2009)

(quoting *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)).

    In this case, plaintiff alleges that her protected activity was petitioning the government for

redress of grievances in the form of her lawsuit against her former employer.  The filing of

lawsuits has been held by the United States Court of Appeals for the Third Circuit to be protected

activity, even when those lawsuits are matters of private concern.  *Brennan v. Norton*, 350 F.3d

399, 417 (3d Cir. 2003) ("a plaintiff need only show that his/her lawsuit was not frivolous in

order to make out a prima facie claim for retaliation under the Petition Clause"); *San Filippo v.

Bongiovanni*, 30 F.3d 424, 443 (3d Cir. 1994) (filing of lawsuits implicate the petition clause of

the First Amendment).  Defendant does not challenge that plaintiff's lawsuit was protected

activity, although plaintiff addressed this issue in her brief in opposition.  Plaintiff states that her

prior lawsuit involving the right to unionize employees was a matter of public concern and it was

not brought as a "sham", thus qualifying as protected activity under *San Filippo*.  The court is

satisfied for purposes of this motion that plaintiff's filing of a lawsuit against her prior employer

was First Amendment protected activity.[1]

---

[1]    The Supreme Court has held in a governmental employment
context that no prior relationship is required before an employee is
permitted to assert a claim for First Amendment retaliation.  More
particularly, the Court in *Rutan [v. Republican Party of Illinois*,
497 U.S. 62, 74 (1990)] held that a government entity's refusal to

While the *McDonnell Douglas* burden-shifting framework in not applicable to a First Amendment retaliation claim, the Court of Appeals for the Third Circuit has held that the causation analysis in a First Amendment retaliation claim is the same as the causation analysis applied to a Title VII retaliation claim.  *Brennan*, 350 F.3d at 420; *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 144 (3d Cir. 2000).

The Court of Appeals for the Third Circuit has held:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. . . .  In the absence of that proof, the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of fact should infer causation.

*Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)(citing *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913 920-21 (3d Cir. 1997) and quoting *Farrell v. Planters Lifesavers Co.*, 207 F.3d 271, 281 (3d Cir. 2000)).

There is no dispute that McCaughan received an email from Kraus recommending that he not interview or hire plaintiff because she sued a previous employer and had credit problems. (Pl.'s App. Ex. 10.)  In the August 3, 2007 document McCaughan, Bocian and Moon noted that

---

hire an employee for engaging in protected activity supports a claim for First Amendment retaliation.
*Oscar Renda Contracting, Inc. v. City of Lubbock, Texas*, 463 F.3d 378, 383 (5th Cir. 2006).

the negative recommendation from OMI was one of the reasons why plaintiff was not interviewed or hired.  (Pl.'s App. Ex. 11.)  When asked if suing a previous employer would be considered in the hiring process, McCaughan stated:  "Not necessarily.  I mean people sue people for who knows what.  It may have been in consideration, but I wouldn't say it was overwhelming." (Pl.'s App. Ex. 5, McCaughan Dep. 42.)

Defendant argues that there is no evidence that Kraus's recommendation motivated McCaughan, Bocian and Moon's decision not to interview or hire plaintiff.  Defendant points to McCaughan's statement that suing a prior employer is not necessarily something that would be considered; Bocian's testimony that suing a prior employer would not be a concern in deciding to hire (Def.'s App. Ex. 3, Bocian Dep. 21); and Moon's testimony that he was unaware of the negative recommendation from OMI  (Def.'s App. Ex. 9, Moon Dep. 13-14), as evidence that defendant did not base its decision on plaintiff having sued her prior employer.

Plaintiff correctly points out, however, that a fact-finder could reasonably make the inference that Kraus's recommendation that plaintiff not be interviewed or hired because she sued a previous employer influenced the defendant's employment decision to such a degree that it was a substantial or motivating factor.  Because it is undisputed that the OMI recommendation was relied upon, and that McCaughan admitted that suing a prior employer could have been a consideration, a reasonable jury could infer from the record as a whole that the plaintiff's prior lawsuit was a substantial or motivating factor in defendant's decision not to interview or hire plaintiff.[2]

---

[2]Plaintiff also argues that causation between the protected activity and refusal to interview and hire can be established by concluding that McCaughan, Bocian and Moon simply rubber stamped OMI's recommendation and were deliberately indifferent.  Plaintiff cites *San Filippo v.*

After viewing the record as a whole, the court concludes plaintiff adduced sufficient evidence to meet the threshold showing of a causal connection between her protected activity and adverse employment decision.  Plaintiff adduced evidence from which a reasonable jury could infer that her protected activity was a substantial or motivating factor in the decision not to hire her.

Plaintiff adduced sufficient evidence to establish the first two elements of a prima facie case of First Amendment retaliation, and the burden shifted to defendant to demonstrate it would have taken the same action.  Defendant did not assert it met that burden.  There are genuine issues of material fact with respect to plaintiff's First Amendment retaliation claim and summary judgment must be denied.

## Conclusion

Based upon the undisputed evidence of record, viewing all disputed facts in favor of the plaintiff and drawing all reasonable inferences in favor of plaintiff, the court concludes for the reasons set forth above that genuine issues of material fact exist that preclude entering a judgment as a matter of law in favor of either party with respect to plaintiff's claims. Defendant's motion for summary judgment must be denied in all respects.

-----

*Bongiovanni,* 30 F.3d 414, 446 (3d Cir. 1994), to support its argument.  In *San Filippo* a university argued that it could only be liable if the board of governors were primarily involved in or knowingly acquiesced in the decision at issue.  The issue raised in *San Filippo* related to municipal liability and the implications of *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Having carefully reviewed defendant's brief, the court did not find any issue raised under *Monell*.  Under those circumstances, reliance on *San Fillippo* in this context appears irrelevant.  Defendant did not raise the issue of municipal liability and this court will not address it.

As appropriate order follows.

By the court,


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge


Dated:          February 23, 2010